UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOMMY POLK,

        Plaintiff,

v.

                                 Case No.  11-13585

CITY OF WARREN POLICE OFFICER       Honorable Nancy G. Edmunds
MICHAEL LEWIS, JR., CITY OF WARREN
POLICE OFFICER DONALD SEIDL, and
CITY OF WARREN POLICE DETECTIVE
BRIAN GILCHRIST,

        Defendants.

_____/


**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

      This matter comes before the Court on Defendants Michael Lewis, Jr., Donald Seidl,

and Brian Gilchrist's motion for summary judgment.  For the reasons set forth below,

Defendants' motion is GRANTED.

**I.**    **Facts[1]**

     **A. The Arrest**

      Plaintiff Tommy[2] Polk owned and operated an "adult rooming house" called Tyler Care

---

     [1] There are a number of topics covered in the depositions and briefs that this
Court does not find relevant to the current motion.  The Court reviewed all of the briefs
and exhibits and only those facts relevant to this motion are stated here.

     [2] Plaintiff's first name seems to be interchangeably spelled "Tommy" and
"Tommie," even in Plaintiff's own brief.

1

Center in Highland Park.  (Tommy Polk Dep. 13:5-7; 116:17-24, Feb. 22, 2012.)  Plaintiff would pick up homeless adults and offer them a room for $400-$500 per month, plus food and transportation to try to help people out and get them off the street.  (*Id.* at 23:19-24:13.) These people (Plaintiff refers to them as his "clients") would earn rent money by doing "odd jobs" for Plaintiff or working at a party store owned by Plaintiff's friend.  (*Id.* at 21:13-22:17.) Plaintiff would provide transportation to doctors or the hospital if his clients needed it and would often drive them to pick up their prescriptions.  He usually had the client with him so the client could sign for the prescription.  (*Id.* at 29:23-30:5; 57:10-19.)

On August 6, 2010, Plaintiff went to a pharmacy to fill a prescription of Oxycontin for Lee Brockman, Plaintiff's client and a resident at Plaintiff's Tyler Care Center.  (Polk Dep. 40:25; 44:12-21.)  Plaintiff had attempted to fill the prescription the day before, but the pharmacy he went to did not have any Oxycontin.  (Polk Dep. 42:6-7.)

Lee Brockman was not with Plaintiff at the time.  Plaintiff gave the pharmacist Brockman's I.D., Medicare card, and prescription.  (*Id.* at 45:10-18.)  Plaintiff states that he did not say that he was Brockman, but he also did not say that he was someone other than the person whose identification he presented and he did not show or give the pharmacist his own picture identification.  (*Id.* at 45:19-46:21.)  The pharmacist, Lorraine Scott, stated that Plaintiff "identified himself as 'Lee Brockman' and presented . . . a Michigan Driver's License, a Medicare Health Insurance Card, and a prescription for Oxycontin, all in the name of Lee Brockman."  (Scott Affidavit ¶ 3, March 30, 2012.)  The pharmacist asked Plaintiff if he had any known allergies and for his telephone number and Plaintiff responded that his Medicare Part D was not active until next month and he was therefore paying cash for his medication.  (*Id.* ¶ 5.)

2

Plaintiff denies that the pharmacist asked him any information regarding Brockman's address or telephone number.  (Polk. Dep. 50:19-22.)  Plaintiff states that the only thing Scott asked him was, "Everything the same?" And he said, "Yes."  (*Id.* at 120:4-14.) Plaintiff states that he did not have any written authorization on him indicating Brockman gave Plaintiff permission to pick up Brockman's prescription.  (*Id.* at 54:12-16.)  Plaintiff did not give the pharmacist his own identification and did not identify himself as Tommy Polk or indicate that he was picking up the prescription for a client or friend.  (*Id.* at 46:18-21; 58:6-20.)

The pharmacist was suspicious of the Driver's License that Plaintiff presented because it had a fingerprint over the picture.  (Scott Aff. ¶ 6.)  Because of her suspicion, the pharmacist asked Plaintiff to have a seat in the waiting area while the prescription was filled and then asked the manager of the pharmacy to contact the Warren Police Department.  (*Id.* at ¶ 7.)

On August 6, 2010, Police Officers Defendant Lewis and Defendant Seidl were on duty in the same car and dispatch notified them that someone inside the pharmacy was attempting to fraudulently fill a prescription.  (Lewis Dep. 7:21-23; Seidl Dep. 16:19-20.) Officer Roy also responded to the call and arrived in a different car at the same time Defendants Lewis and Seidl did.  (Lewis Dep. 8:3-9.)

Plaintiff states that he was was sitting in the waiting area of the pharmacy when the police arrived.  He states that as soon as the police arrived, they told him to stand up, put handcuffs on him, and then told him to sit down.  (Polk. Dep. 61:3-17.)  Plaintiff states that all three officers went to the back of the pharmacy and left him sitting alone near the door. (*Id.* at 61:17-19; 63:6-10.)  Defendants Lewis and Seidl state that Defendant Lewis went

3

to talk to the pharmacist and Defendant Seidl stayed with Plaintiff.  (Lewis Dep. 7:21-23; Seidl Dep. 26:25-28:3.)

Defendant Lewis asked the pharmacist what happened and she hold him that the gentleman talking to Defendant Seidl and Officer Roy (Plaintiff) came to the pharmacy, gave her an I.D., identifying himself as Brockman, and giving her a Medicare card identifying himself as Brockman and a prescription made out to Brockman.  (Lewis Dep. 9:9-14.)  The pharmacist told Defendant Lewis that she became suspicious of the I.D. because it had a fingerprint underneath the laminate of the driver's license itself, so she asked Plaintiff if he had any allergies, he stated he did not, and she asked him for his phone number and he gave her his number.  (*Id.* at 9:15-20.)  The pharmacist then showed the other workers the I.D. with the fingerprint and they were also suspicious, so they called the police.  (*Id.* at 9:21-24.)  Defendant Lewis had the pharmacist fill out a witness statement, which, in the pharmacist's writing, states:

> Presented ID w/ Medicare care - as thou he was Lee Brockman, asked any know drug allergies?  Home phone #
> He told me his Medicare part D is not active until next mo.  He's paying cash for his medication.
> ID looked fake - finger print over picture.

(Def. Mot. Ex D.)

After speaking to the pharmacist, Defendant Lewis talked to Defendant Seidl and Officer Roy and explained that Plaintiff had tried to identify himself as Lee Brockman to obtain a prescription for Oxycontin.  (Lewis Dep. 12:4-7.)  Defendant Lewis states that at that point, Defendant Seidl placed Plaintiff under arrest.  (*Id.* at 12:9-10).

Plaintiff states that after all the police officers left him alone to speak with the pharmacist, they came back and asked if Plaintiff had anything in his pockets, removed

4

his wallet and keys from his person, asked if they could search Plaintiff's truck and

Plaintiff "told them no."  (*Id.* at 62:14-18.)  The police then searched Plaintiff's truck.  (*Id.*

at 62:18-19.)  Defendant Seidl stated that Plaintiff identified himself as Tommy Polk and

said that he was there to obtain a script for a friend of his for whom he is a care giver.

(Seidl Dep. 19:13-19.)

Plaintiff originally stated at his deposition that the only question the police asked

was whether they could search his truck and that neither Plaintiff nor the officers

initiated any other conversation.  (Polk Dep. 65:8-24.)  Plaintiff stated then stated that

after the police officers put him in the back of the squad car, he asked the policeman

from the other car (Officer Roy) if he could roll down the window because it was hot in

the car, so the police cracked the door open, but that was the only other

communication.  (Polk Dep. 66:8-67:67.)

Plaintiff stated that after the police searched his car, they took out the drugs that

they found and they asked Plaintiff what drugs they were and he told them "psychiatric

medications for my clients."  (Polk. Dep. 81:14-23.)  Plaintiff then indicates that he told

the police officers that there were drugs in his car *before* they searched it and that he

had already told them about the Tyler Care Center:

> A.      . . . they asked me was anything in my pocket, before they checked
> my pockets and took my keys, took my wallet.  And they asked me was any
> type of drugs inside my car and I told them, no, psychriatic medication.
> Q.      You told me a moment ago now, because this new, that you told the
> police officers that there was psychiatric medication for your clients.
> A.      Yes.
> Q.      How did the police officers know about your clients? You told me
> before you didn't have any other conversations with them. Did you tell them
> about the Tyler home . . . Tyler Care Center?
> A.      Yes.
> Q.      Before or after you were placed in the back of the police car?

> A.  I told them before.
> Q.  After they were done talking to the pharmacist but before --
> A.  I told them before they went into my truck and even looked for anything. They asked me was anything in my truck, narcotics, whatever. I told them no.

(Polk Dep. 82:3-25.)

Plaintiff states that in addition to the prescription medication in several people's names, he had flyers in the back of his truck that advertise for Tyler Care Center. Plaintiff left these at hospitals and other places to try to help people out.  (Polk. Dep. 122:23-123:4.)

Defendants Lewis and Seidl drove Plaintiff to the Warren Police Department and Defendant Seidl booked Plaintiff in while Defendant Lewis wrote the report.  (Lewis Dep. 13:23-25; 14:8-9.)  Plaintiff stated that one of the arresting officers told Plaintiff that he thought Plaintiff might be telling the truth.  (Polk. Dep. 67:2-11; 124:2-5.)

The Police Incident Report reflects the same information that the pharmacist, Defendant Lewis, and Defendant Seidl gave in their affidavit, witness statement, and depositions.  (See Def. Mot. Ex. F.)

Defendant Seidl stated that he did not think that they had probable cause to arrest Plaintiff when they first arrived at the pharmacy, but then they heard the pharmacist's account that Plaintiff had identified himself as Brockman and had answered questions as if he were Brockman in order to obtain a prescription for a controlled substance.  (Seidl Dep. 26:10-23.)  Defendant Seidl stated that they trusted the veracity of the pharmacist's statement because she had no reason to lie.  (Seidl Dep. 28:10-25.)  Defendant Seidl stated that he and Defendant Lewis made the decision to arrest Plaintiff based on the facts that "he identified himself as Mr. Brockman

6

to get a script of Oxycontin, and that [they] weren't able to identify – or get in contact with Mr. Brockman to verify whether [Plaintiff] was actually his care giver and had authorization to do that."  (Seidl Dep. 32:1-8.)

### B.    The Prosecution

#### 1.    The Charges

On August 9, 2010, Plaintiff was charged with four counts: (1) forging a driver's licence with intent to commit a crime, (2) obtaining a controlled substance by fraud, (3) obtaining a controlled substance by false name, (4) and possession of a forged prescription for a controlled substance.  On January 26, 2011, after several continuances, the judge dismissed the charges against Plaintiff without prejudice when the pharmacist did not appear for the hearing.

#### 2.    Defendant Lewis

After the arrest, Defendant Lewis had nothing to do with the issuing of the warrant.  (Lewis Dep. 17:1-3.)  According to Defendant Lewis' deposition:

> Q.    You did not prepare a Warrant Authorization Request?
> A.    No, I did not.
> Q.    You did not investigate this matter nor would it be your responsibility to after [Plaintiff] is processed?
> A.    No, I did not.
> Q.    Your responsibilities as a police officer include only making the arrest and not further investigating after there's been an arrest; is that correct?
> A.    Yes, it is.
> Q.    And in the normal course you would have provided the information that you had in your report to your supervising officer and that would go wherever it was normally supposed to go, correct?
> A.    Yes.
> Q.    And you did that in this case?
> A.    Yes, I did.
> Q.    And that would be the end of your involvement?
> A.    Yes, it would.

7

Q.      And that was the end of your involvement in this case?
A.      Yes.
Q.      Did you ever see [Plaintiff] again after you processed him in the Warren Police Department?
A.      No, I don't.
Q.      Were you involved in the court proceeding at all?
A.      No, I wasn't.
Q.      Did you have any idea what he ended up being charged with by the Assistant Prosecuting Attorney?
A.      No, I do not.
Q.      Would you have any involvement with him being charged with particular crimes by the Assistant Prosecuting Attorney?
A.      Only if I receive a Subpoena which I – I don't recall receiving one.

(Lewis Dep. 19:12-20:20.)

### 3.      Defendant Seidl

Defendant Seidl testified that following his decision to place Plaintiff under arrest, Defendant Seidl had nothing to do with issuing a warrant or speaking with anyone about filing particular charges.  (Seidl Dep. at 37:8-12.)  The last thing Defendant Seidl did in regard to this matter was book Plaintiff in the jail.  (*Id.* at 37:15-18.)  Defendant Seidl was not aware of any, or which, formal charges were filed against Plaintiff and never attended any court hearings with respect to the criminal charges.  (*Id.* at 38:12-17.)

### 4.      Defendant Gilchrist

Defendant Gilchrist was the Drug Unit Detective assigned as the officer in charge of Plaintiff's case.  (Gilchrist Dep. 8:21-22.)  This was a weekend arrest, however, and Defendant Gilchrist worked Monday through Friday, so Defendant Gilchrist did not prepare the file for this case.  (*Id.* at 8:23-9:9.)  By the time that Defendant Gilchrist got this file, the entire file had been presented to a prosecutor, the prosecutor had authorized a warrant, and bond was set.  (*Id.* at 9:20-25.)  In general, a detective does

8

not have discretion to decide whether or not there's enough evidence to go to the

prosecutor, the case automatically goes to the prosecutor and the prosecutor makes the

decision who to charge and what the charges are.  (*Id.* at 13:9-13; 16:24-17:3.)

The warrant in this case was authorized independent of Defendant Gilchrist's

involvement, as a warrant would have been authorized independent of any detective

involvement with any case of the Warren Police Department.  (*Id.* at 19:4-10.)  Detective

Gilchrist is listed as the "complaining witness" on the complaint, but that means only that

he is the go-between and is the one they call if the prosecutor needs something or

something is missing from the file.  (*Id.* at 21:2-14.)

## II.    Standard

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by

'showing' – that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S.

317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
> > (A) citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information,
> > affidavits or declarations, stipulations (including those made for
> > purposes of the motion only), admissions, interrogatory
> > answers, or other materials; or
> > (B) showing that the materials cited do not establish the
> > absence or presence of a genuine dispute, or that an adverse
> > party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to

9

properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly
> address another party's assertion of fact as required by Rule 56(c), the court
> may:
>> (1) give an opportunity to properly support or address the fact;
>> (2) consider the fact undisputed for purposes of the motion;
>> (3) grant summary judgment if the motion and supporting
>> materials – including the facts considered undisputed – show
>> that the movant is entitled to it; or
>> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may

consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately

a district court must determine whether the record as a whole presents a genuine issue

of material fact, drawing "all justifiable inferences in the light most favorable to the non-

moving party," *Hager v. Pike Cnty. Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.    Analysis

Plaintiff brings this action under 42 U.S.C. § 1983, alleging that Defendants

violated his Constitutional rights by unlawfully arresting him and maliciously prosecuting

him.  Defendants claim that they are protected by qualified immunity and that they acted

objectively reasonably.

A defendant government official enjoys qualified immunity on summary judgment

unless the facts, when viewed in the light most favorable to the plaintiff, would permit a

reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the

10

right was clearly established.  *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394 (6th Cir. 2009).  Once it is determined that the right is clearly established, the court must determine "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights."  *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)) (alteration in original).

Where a defendant raises a qualified immunity defense, the plaintiff then bears the burden of proving that the defendant is not shielded by qualified immunity.  *Walters v. Stafford,* 317 F. App'x  479, 485 (6th Cir. 2009).  Application of the qualified immunity doctrine is a matter of law for the court.  *Dickerson,* 101 F.3d at 1157.  The inquiry is conducted from the perspective of the officers, considering only the facts they knew at the time of the incident.  *Id.* at 1155.

The test for qualified immunity is meant to be highly deferential to officials, protecting "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The official will be immune "if officers of reasonable competence could disagree on whether the conduct violated the plaintiff's rights."  *Id. (*internal quotation marks and citation omitted).  As the Sixth Circuit has stated, the Fourth Amendment "does not require officers to use the best technique available as long as their method is reasonable under the circumstances."  *Dickerson,* 101 F.3d at 1160.

Even defendants who have in fact violated constitutional rights may be protected if their actions were nevertheless objectively reasonable at the time of the violation.

11

*Davis v. Scherer,* 468 U.S. 183, 190 (1984).  *See also O'Brien v. City of Grand Rapids,* 23 F.3d 990, 1000 (6th Cir. 1994) (concluding that the officers were not, in law, excused from obtaining a warrant "but we cannot say that no reasonable officer . . . could conclude that there were exigent circumstances excusing the requirement that a warrant be obtained.").

### A.   Unlawful Arrest

#### 1.   Defendant Gilchrist

Plaintiff has presented no facts that suggest that Defendant Gilchrist was involved in Plaintiff's detainment or arrest.  He was not on the scene and his first involvement with the case was three days following the arrest.

#### 2.   Defendants Lewis and Seidl

It is clearly established that a person has a Constitutional right to be free from unlawful seizures.  A law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  The Supreme Court has defined probable cause, at least for the purposes of making an arrest, as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. Defillippo,* 443 U.S. 31, 37 (1979).  In ascertaining probable cause, police officers are entitled to rely on information provided by a police dispatcher and presume that information is accurate and reliable.  *Feathers v. Aey,* 319 F.3d 843, 851 (6th Cir. 2003).

12

In this case, Plaintiff argues that there was absolutely no reason to believe that Plaintiff was committing a crime because "picking up another individual's prescription with their consent and at their request is not a crime" and "he was not in the possession of a false identification card or a forged prescription."  The standard, however, must be judged on the facts and circumstances within Defendants' knowledge at the time. Plaintiff told Defendants that he was a care giver for Brockman and was picking up the prescription on his behalf.  However, Plaintiff did not have written consent and the officers were unable to reach Brockman by phone.  Defendants did not know that the I.D. card that Plaintiff presented for Brockman was not fraudulent or that the prescription was not forged.

Defendants got a call from dispatch telling them someone was attempting to fraudulently obtain a prescription.  Defendants were told by the pharmacist that Plaintiff had identified himself as Brockman and attempted to obtain a prescription using that name and presented a suspicious-looking driver's license.  Defendants determined they had no reason not to trust the pharmacist's statement and saw a photocopy of the I.D. and how fraudulent it looked.

Defendant Seidl testified at his deposition that "obtaining a script by fraudulent means" is having a fake script with a forged doctor's note.  (Seidl Dep. 14:4-6.)  He states that in determining whether a prescription is forged or not, the police go by the pharmacist's statement, if the pharmacist has contacted the doctor and the doctor said it was a fake script.  (Seidl Dep. 14:5-20.)  Seidl also stated that if the pharmacist does not tell the police that they contacted a doctor then the police "don't arrest for a fraudulent script then because [they] have to have somebody saying that I did not write

13

2:11-cv-13585-NGE-LJM   Doc # 16   Filed 07/02/12   Pg 14 of 17   Pg ID 361

this script or that its fraudulent." (*Id.* at 15:8-13.)  In this case, Defendant Seidl did not

have any direct knowledge about whether the pharmacist called the doctor because

Defendant Lewis is the one who talked to the pharmacist.  (Seidl Dep. 15:16-16:14.)

Defendant Lewis, however, testified that they were not there because the prescription

was fraudulent, they "were there because he was using a fake I.D. to obtain a

prescription narcotic."  (Lewis Dep. 10:15-18.)

It may be true that Plaintiff, in fact, was not committing a crime.  At the time of the

arrest, however: (1) Defendants received the dispatch call stating that Plaintiff was

attempting to fraudulently obtain a prescription, (2) the pharmacist told Defendants that

Plaintiff had identified himself as Brockman and answered several questions as if he

were Brockman[3], (3) Plaintiff told Defendants that he was picking up the prescription for

someone for whom he is a care giver, (4) Plaintiff did not have written authorization from

Brockman to pick up his medication, and (5) Defendants were unable to reach

Brockman to confirm Plaintiff's authorization.  Defendants made the decision to arrest

Plaintiff on the information available to them at the time, believing the pharmacist's

statement and unable to verify Plaintiff's claims.

Plaintiff has failed to show that Defendants Lewis and Seidl acted objectively

unreasonably by placing Plaintiff under arrest based on the knowledge they had at that

time.  Defendants' motion for summary judgment is GRANTED as to the unlawful arrest

charge.

----

[3] Even taking Plaintiff's version of the facts as true, Plaintiff does not dispute that
the pharmacist relayed her version of the story to Defendants.  The issue is not which
version is true, it is what information Defendants had access to and relied upon at the
time.

14

### B.     Malicious Prosecution

There is a constitutionally cognizable claim of malicious prosecution under the

Fourth Amendment, "which encompasses wrongful investigation, prosecution,

conviction, and incarceration." *Barnes v. Wright,* 449 F.3d 709, 715-16 (6th Cir. 2006)

(internal quotation marks omitted).  It is distinct from the tort of false arrest.  *Wallace v.*

*Kato,* 549 U.S. 384, 390 (2007).  The Sixth Circuit has determined that in order to

succeed on a malicious-prosecution claim, a plaintiff must show: (1) a criminal

prosecution was initiated against the plaintiff and that the defendant made, influenced,

or participated in the decision to prosecute; (2) there was a lack of probable cause for

the criminal prosecution; (3) as a consequence of a legal proceeding, the plaintiff

suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence,

apart from the initial seizure; and (4) the criminal proceeding must have been resolved

in the plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010).

In the first element, "the term 'participated' should be construed within the context

of tort causation principles.  Its meaning is akin to 'aided.'  To be liable for 'participating'

in the decision to prosecute, the officer must participate in a way that aids in the

decision, as opposed to passively or neutrally participating." *Id.* at 308 fn.5.  Malice is

not an element of a § 1983 suit for malicious prosecution.  *Id.* at 310.

In this case, Plaintiff has failed to establish the first element required to assert a

claim for malicious prosecution.  Plaintiff must prove that Defendants made, influenced,

or participated in the decision to prosecute.  Plaintiff has shown nothing to support this

allegation.  Plaintiff's sole argument is that Defendants did not have probable cause for

the arrest and the conclusory statement that:

15

> [I]t is clear that Defendants made the decision to charge Plaintiff and with the
> particular charges leveled against him. Defendants did absolutely nothing in
> furtherance of their investigation once the pharmacist accused [Plaintiff] of
> committing a crime. The moment she made the statement, Defendants were
> convinced that he was committing a crime. Defendants cannot rely on the
> prosecutor's preliminary exam to shield them from liability.

(Pl. Resp. at 13.)

Defendants can rely, however, on the fact that the record in this case shows that they had nothing to do with the decision to prosecute. Assuming, *arguendo*, that there was no probable cause to bring some, if not all, of the charges against Plaintiff, Plaintiff's claim of malicious prosecution against these Defendants still fails. These Defendants were not involved with this case after Plaintiff was booked in the jail on August 6, 2010 (and in Defendant Gilchrist's case, not involved in this case at all). Plaintiff has not alleged any facts to suggest that any of Defendants made, influenced, or participated in the decision to prosecute. There are no facts that show that they even had knowledge of the charges brought or any interaction with the prosecutor.

There is no issue of material fact and Defendants' motion for summary judgment is GRANTED.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: July 2, 2012

16

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 2, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager